We're ready to hear from the appellant in case number 1984, United States v. Kahn. This is Dr. Kahn. Good morning, your honors. My name is Beau Brindley and I represent Dr. Shaquille Kahn. The first issue I'd like to discuss this morning is, once again, the good faith instruction, although we come at it from a much different vantage point. It was our view when we submitted our proposed instruction that the issue of good faith in these physician cases is a subjective question. The district court instructed the jury that good faith connotes an attempt to act in accord with what a reasonable physician should believe to be proper medicine. And based on that instruction, if a jury believed a doctor was unreasonable or negligent in his beliefs about what normal practice was, while honestly trying to do what he believed was within the normal course of practice, that doctor, by definition, could not act in good faith. And the cases are uniform in saying that negligence, even gross negligence, is not sufficient to rise to the level of criminality under Section 841. What the good faith instruction, as composed by the court, did was it permitted conviction if the jury thought that Dr. Kahn was reckless or unreasonable about his beliefs of what constituted proper medical practice, but still honestly believed that he was doing that. And the law does not permit such convictions because it won't allow conviction for negligence, no matter how gross. And that's a big problem in our case. Dr. Kahn's entire defense and his testimony was that he maintained beliefs about what was enough, what was acceptable medical practice, and that he honestly attempted to follow those. He put in place contracts and he put in place documents. When you're talking about objective medical practice, does it matter what he believes? Isn't that a different area of consideration? No. Objective consideration is one thing. That is, he thought he was treating people properly. That's in his own head. Yes. And the objective prong, it seems to me, is what is acceptable in medical practice. That is not something that is in his own head. That is, what does a practitioner do in this area? Well, that's where the law on this is very vague and it's very confusing. Because it is correct that there is an objective standard that the government proved about what is appropriate for a medical practitioner. However, it was also the case that the court instructed, as you should have, that the government must prove that Dr. Kahn intended he was knowingly acting outside the normal course. And that's a subjective consideration. And what Dr. Kahn testified was that he put in place all of these forms and these steps that he took because he thought that was sufficient, if he did that, to avoid criminal conduct. Specifically, he said that. And the problem here is that the district court's instruction did not allow for that. If the jury found, well, Kahn honestly thought he was going to be able to do this and he put these steps in place. But the good faith instruction says that if an objectively reasonable doctor wouldn't have thought that, he's not acting in good faith. Good faith is an element of this and good faith was taken away from Dr. Kahn. Because when it comes to that subjective question of did he intend to go outside of the normal course, it has to be written such that it allows for the jury to find, well, he was wrong about what he thought was okay and sufficient, but he honestly tried to do that. Especially in a case like this. And so he's innocent if he honestly tried to do that? Or can he be convicted whether he honestly thought, but he was wrong? If he honestly thought it was wrong, he cannot be convicted because that would… What law are you, what case or law are you citing for that? Well, there are multiple cases we cited in our brief, including Moore in the Supreme Court, including Coley in the Seventh Circuit. And the bottom line is this, Judge. It comes down to the fact that the government must prove that he intended to act outside the normal course. District Court agreed with that. Everybody seems to agree with that. So if he had to act intentionally outside the normal course or knowingly outside the normal course, then if he thought he was acting the normal course and was wrong, by definition, he did not knowingly act outside the normal course. What do you do with our case of Nilsson where we try to define the necessary proof in this type of case for a medical practitioner? Well, I think it's very difficult is the answer. I think it's very difficult to define the necessary proof. But there's nothing about that case that changes the fact that you have to prove that he intended to act outside the normal course. And if that's possible, if you give a good faith instruction that allows him to be convicted for being wrong, you're allowing a serious risk of conviction for negligence, especially in a case like this where Dr. Khan was open about what he did. I thought I took these steps and these were enough to protect me. And he came right out and said it. And the jury needed to be able to say, well, if he honestly believed that even though he was wrong, he's not guilty. And Nilsson, didn't we hold very succinctly that a valid prescription must be both issued for a legitimate purpose and within the scope of medical practice? Yes, but that's separate and apart from the mens rea requirement because as the judge found in the district court here, the mens rea requirement has to apply to both. It has to apply to outside the normal course of professional practice, and it has to apply to acting both elements there. Okay, so I want to be clear on what challenge as regards mens rea are you raising for what charges? The conspiracy charge? And all of the charges involving Dr. Khan writing prescriptions. Because every single one of those requires proof that when he wrote the prescription or engaged in the conspiracy, he was knowingly acting outside the normal course. And the problem here is, is the judge said, well, he can't if he's wrong. And he's not acting as a reasonable doctor would he's guilty. And that allows conviction for negligence, which the more Supreme Court was worried about. And all these courts have been worried about is cited in our brief. And that was Mr. Khan's whole defense. And therefore, it should result in his conviction being reversed. I'd like to turn my attention now if I could do some of the other issues here. I want to speak, first of all, about the search warrant. And the issue that we've raised, we've raised several, but one important thing about these search warrants that stands out here is the lack of specific evidence tying the patient files that were this things they were looking for these particular files to either one of these residents. There was there was evidence that the agent provided about what street drug dealers do and how they keep stuff in their house. But the district court didn't really rely on that in its opinion, as we argued, because the agent didn't have any experience stated in dealing with doctors who have an office to keep all this stuff in. And so there was no indication in the record or in the affidavit provided to the magistrate to indicate that these particular patients were even seen in the in the requisite states or which house. Why do they believe that these files would be in the house? The only thing they ever identified was one call where Lin Khan and Shaquille Khan were on the phone and he said, well, I'm cleaning out my office, so I got to take some files home. And that was in Wyoming, not in Arizona. And that's one call, and they didn't indicate when it happened. But the problem with that is it happened specifically because, according to Dr. Khan, in this unique circumstance, he's cleaning his office, which suggests he wasn't normally keeping files at home. And they didn't provide any evidence that the keystone of all of this, these patient files, no reason to believe that they would be located at those houses, either in Wyoming or in Arizona. And because of that, those patient files should have been suppressed and so would end, essentially, Dr. Khan's case. I mean, couldn't you draw the inference that when he said he was cleaning out his office, that that did mean he was going to start keeping files at home? Maybe he was going to start taking files he didn't need at the office and keeping them there? I think there's too many maybes in that in that proposition, Judge. There's maybes in yours, too. That's true. That's true. But the issue here is one statement that on one occasion I took some files home without any more is certainly not going to allow sufficient evidence to say it's likely that patient files, these ones, and I go back to that. Are these specific eight that they're talking about, the named patients, is there any indication they would be in the Wyoming house? Did they even say that they were seen in Wyoming? They did not. And so because of that, it's not good enough. They needed a lot more to tie these particular files to these particular houses, and they didn't do that. The other thing I'd like to say something about is the two things. First, the cash money, which was located in the safe in Arizona. The Arizona Warren, as everybody acknowledged, did not include authorization to take cash. Of course, they took it anyway and they found it and they took it. And the judge in the district court said, well, it was it's plain view. The problem with that is twofold. At that time, with everyone is acknowledged in the government, their brief acknowledged the they did not have evidence to prove that all of Shaquille Khan's doctor visits and patients was illegal. And so they had no way to say, well, any money he's got is illegal money. They didn't have that when they went in there. On top of that, the Hicks case in the Supreme Court says if you have to manipulate the evidence or do further investigation in order to determine its criminal proceeds, then you do not have plain view. And here what we had was they opened a safe and had envelopes with money in them. They had to open the envelopes to find the money. And the mere act of opening the envelopes, I think, violates Hicks, especially as they're going to get an item that was not permitted by the war. And so that money should have been suppressed as well. Yes. Did the warrant cover searching the safe? Was there a warrant to open safe? I don't recall the warrant specifying opening of any safe. Maybe the government correct me if I'm wrong, but I don't I don't recall that, Judge, but I'm not certain. So just by way of clarification, and I know you've been arguing about the location or the nexus issue. Yeah. Is it your position? Slightly different issue. Is it your position that the affidavit needed information about all 51 patients? I think the affidavit needed more information than what was in it. And what I mean by that is outside of the eight, they got these 51 patients. But the only thing they say about them is, well, we had some other individual or body find that there were red flags. They didn't say how many red flags applied to who. They didn't say if there are multiple red flags per person. And they didn't say who it was that figured it out or made the assessment. And that prevented the magistrate from independently assessing how accurate any of that could be or how sufficient any of it could be because of how they did that. So in that sense, I believe it's insufficient. I want to ask you a question about the finding of the money. Let's backtrack here a little bit. So your position is that they shouldn't have seized the money because it wasn't described in the warrant, right? It wasn't listed as an item to be seized, right. Right. Well, would you agree with me that, you know, combined with the other evidence that having the million bucks in your safe could be indicia of participating in the activity the government's alleged? Depending on what the other evidence is. At the time, they didn't have much because they hadn't been able to investigate the patient files. Because they didn't know how many of these patients there was a problem with. Well, they knew he had some red flags, red prescribing flags, right? They said that they had heard that from some other body, although I just told you I didn't like that. But yeah. Okay. All right. Well, fair enough. I'm not going to badger you about all the other evidence. But I mean, the money by itself, obviously, if all there was was a million dollars when they went in there, that's not indicia of a crime. But I guess my question is, is it's not your position that that can't be used as evidence of a crime, is it? No, no, it could be. It could be in certain instances. Absolutely. It could be. My problem here is I don't think it meets plain view. Okay. Let me let me ask you another question about so say they went in there and pop that safe open and there were a bunch of prescription bottles in there. What would your position be on that? I would, of course, I'd want to know whose prescriptions they were. If they were for the eight people, I would say absolutely. Then what if they were just for random people that nobody knew who they were, but he had, you know, 100 prescription bottles sitting in there in his safe in Arizona? I don't think that would meet the requirements of plain view without more. We didn't know who those were or if those were at all suspicious. Okay. For a doctor. I see that I'm about to run out of time. I'm going to say one more thing before I do. I think it was absolutely improper for the court to consider the cost as a reason not to grant the mistrial. And with that, I'm going to run out of time. We're ready to hear from the government. Thank you, Your Honor. I think I'll start where Mr. Brindley left off and where Mr. or Judge Matheson had left off before. I agree with Mr. Brindley that it was probably improper if that was the only reason the court denied the motion for a mistrial, that it cost a lot to the government to put that on and everybody else. But clearly, I think what the judge was saying in this particular matter was that there had been a lot of work put into this. There had been a lot of evidence presented to the jury. And this misstatement by the law enforcement officer was not prejudicial enough to warrant a mistrial. And when you look at the standard for whether or not you reverse for failing to grant a mistrial, you have to really look at what was the evidence there, what was said. And in this case, it was slightly prejudicial. And we admitted that at trial because the officer that was talking said that they were listening to Shaquille Khan's jail calls. And at the time, although the jury didn't know it, Shaquille Khan was incarcerated, but we had gone to great lengths not to talk about his incarceration. But that one statement isn't akin to the argument that the defendant advances in his brief, that it's the same as sitting a defendant across from the jury in shackles for the entire period of the jury, of the trial. This is more akin to making an improper remark that was really inconsequential in light of all of the evidence against Shaquille Khan in this case. Moreover, there had been some information that was elicited from trial counsel, from Lynn Khan, about her being arrested and being in jail prior to trial in this matter. So it wouldn't have been a stretch for the jurors to imagine that a person who's charged with a federal crime would have been arrested for the crime. And we rely on the district court's subsequent written order on the mistrial? Yes, Your Honor, we do. Do you rely on it in your briefing? Because your arguments thus far have only been what the court said at the time. I don't think we did rely on it in our briefing, but the court outlined the reason that he gave the limiting instruction and found that it was not a prejudicial remark or not so prejudicial that it affected the defendants in the jury's verdict, Your Honor. But the reasons given then in his written order differ from the reasons he gave orally during trial. They do, Your Honor. And they support a reasonable determination that it was not appropriate to grant a mistrial at the time. I'd also like to talk about the search warrant. First of all, I think it's important to note that the defendant in this case does not contest the application of Leon to the warrants in this matter. And so unless there is a finding that the officers were unreasonably relying on the warrant, the searches should stand and the subsequent seizures as well. I understand that the million dollars in the gun were not part of the warrant, but Leon good faith exceptions should apply in this matter. And the money we're talking about is money found in the Arizona residence? Yes, Your Honor. So there was the million dollars in cash in the safe in the Arizona residence and the 49 firearms in the residence. So how can the money be in plain view if it was in a safe? Well, the officers had permission pursuant to the search warrant to search for information or indication of financial transactions. That was part of the search warrant. So they were looking for financial transactions. And in this case, there was evidence and probable cause established in the search warrant that Nabil Khan and Shakil Khan, excuse me, that Shakil Khan and Lynn Khan were receiving money wire transfers. That Lynn Khan was working at or was living at the Arizona house and fielding phone calls and working from the Wyoming office at the Arizona house about a month prior to the time that the search warrant was executed. There was also indication that there was $3 million over the course of about five years that was made by Shakil Khan and that the financial accounts that the officers found didn't contain the $3 million. It was short. And so they had reason to believe that there was money secreted somewhere else. And so the officers had permission to not only be in the Arizona house, but to look in areas where those types of things, financial instruments, prescriptions, patient files could be found. It would be reasonable to think that they would be in that safe. How did they get into the safe? If I recall correctly, Nabil Khan left them in the safe. There were two safes. In fact, there might have been three, but I think the money we're talking about was in one safe. And if I remember correctly, Nabil Khan left them in that safe. And is this an issue on appeal in this case by Shakil Khan? No, Your Honor, nor from Nabil. That they did not have a lawful right to access the object, that is, look at the money in the safe or get the money in the safe? That's correct, Your Honor. They do object to seizure of the guns, which they say is similar to, I can't remember the case that has the stereo equipment that they turn it over. And so it wasn't immediately or readily apparent that the stereo was stolen or contraband. But they only equate that to the guns, not the money. Going on about the search, I want to talk a little bit about the nexus between the Arizona home and the items that they were searching for in the Arizona home. What was made clear in the affidavit, and it was very lengthy, was that there was probable cause, and probable cause is a very low standard. There was probable cause to believe that Shakil Khan didn't keep his business separate from his private life or his businesses separate. He started his business in Arizona, and he kept his business open in Arizona and took his business to Wyoming and opened a practice there. He saw patients from Arizona in Wyoming, and he also went back to Arizona to see patients as well. Did he see patients in his home in Arizona? There was no evidence of that in the affidavit, Your Honor. And that's all we have to go on. So even though there might have been some that came out in trial later, that was not before the magistrate court when they were deciding whether or not there was probable cause to search in the Arizona home. What the magistrate did also know was that Shakil Khan had a separate business, a vaping business in Wyoming. And over the course of the time that the investigation happened, there was a wire where they heard over conversations between Shakil and Len Khan and others. And on one occasion, Shakil was saying that he was taking a safe from VapeWorld home. Now, that becomes important, not because VapeWorld and home are being commingled. It becomes important because VapeWorld was also being, was also overlapping with the business of his medical practice in Wyoming, in that he sent patients to VapeWorld to get prescriptions. And there was money that was deposited from patients into the VapeWorld account. And so he wasn't keeping things separate. What the district court also found when reviewing the search warrant and whether or not there was probable cause to believe that things would be found there was that it was parsing too finely or looking for too fine of a definition or distinction between the Arizona house and the Wyoming house. And found that there was plenty of probable cause that Shakil Khan was taking files home to his house. And although that only was heard one time on the phone call, it didn't necessarily evoke a response from Len Khan of surprise or anything else. It just seemed like it was routine. And the district court mentioned that. The district court also mentioned that because Shakil Khan's license had been suspended in Arizona about, I think, three months prior to the search warrant. And Len Khan had been there right prior to the search warrant and was taking calls that were forwarded to her cell phone from the business in Wyoming. But it wouldn't be unreasonable to think that Shakil Khan would do, would practice medicine or do things at the home to avoid being detected by the Arizona Board of Medicine for practicing in Arizona when his license was suspended. Additionally, the district court did not have any heartburn with the fact that there was only that one reference made during the phone calls of Shakil Khan taking folders home. And found that it was only in September that they were listening to these phone calls and didn't have phone calls that were intercepted between 2011 and 2016. And really common sense dictates that it wouldn't be unusual for doctors to take their work home or attorneys to take their work home or anybody to take their work home and work there. The hours are long and it's not out of the ordinary for people to take work home. As far as the patient files go, the defendant complains that the affidavit lacks specificity about which patient files were actually seeing, that they were seeing red flags for prescriptions on the PDMP. But what the affidavit said was, these are red flags that we're seeing in Shakil Khan's prescriptions. We have reason to believe that he's selling prescriptions for money. And based on these red flags, we'd like to look at patient files to determine if that in fact is true and if the patients are participating in that venture. Well, I understand that Mr. Brinley is saying that there's about eight patient files that they actually said specifically, this is what we're observing in the PDMP. But based on the stat case from this circuit, which said that the seizure of all files of a doctor's patient files were justified to determine if patients were involved in the scheme to over-prescribe or distribute, we should be able to say, looking at the facts of this case and the affidavit and the information presented there, that they could at least seize the files that they were looking for and had particularly articulated. And they had reason to believe that he was practicing in both places, Wyoming and Arizona, so it was possible that those files could be anywhere. It should be noted, Your Honors, that this was only one set of search warrants that was executed. There were other search warrants executed later where other patients' files were seized. There were patient files that we acquired by permission, they were just given to us. And so it's really difficult to know which patient files in particular that the defendant takes issue with. I'd like to move quickly, since I only have about three minutes left, to the good faith instruction. And I think it's important to note that the good faith instruction that the court gave seemed to be patterned very closely after the Schneider case. Additionally, as we argue in our brief, this sort of objective standard good faith instruction has been embraced by this circuit and other circuits as the proper way to instruct the jury on how to assess the mens rea of a medical doctor. Well, is that the defendant's argument here that the objective standard was improperly instructed? I thought the thrust of what he's arguing is that the subjective standard was not properly instructed. Right, he's saying that he would rather have had the subjective, I believe, he's saying he would rather have the subjective good faith instruction that he proposed given rather than the court's good faith instruction. That's how I understand it, Your Honor. And what I'd note too is if you put the instruction that Shaquille Khan proposed next to the instruction that the court gave, instruction 39, they're very similar. For example, Shaquille Khan's instruction indicated that it would have asked the court to instruct the jury that good faith connotes an honest effort to treat patients in compliance with generally recognized and accepted standards of medical practice. That seems like an objective standard. What instruction 39 said is that good faith connotes an attempt to act in accordance with what a reasonable physician should believe to be proper medical practice. So they seem very similar. Counsel, how would you answer the argument we heard that the instruction given would allow a jury to convict for negligence? I would argue that that's incorrect. And if you look at the Vamos case, it has some conversation about the fact that it would be difficult to imagine a situation where a field that is so very regulated, like the medical practice and the doctor being a participant in that regulated field, would have an unreasonable belief of what it would mean to prescribe outside the usual course of medical practice. So I agree that these instructions, the good faith instruction is given so that the jury doesn't convict on malpractice. But they have to believe that the defendant made an honest effort to prescribe in accordance with objectively reasonable standards. But if they think he was doing that and fell short, like a person might do in negligence, then he necessarily wouldn't be agreeing with the other co-conspirators to distribute prescription drugs outside the usual course of medical practice. If he honestly believed that he was, excuse me, if he honestly made an effort to prescribe in accordance with practices, then he couldn't agree to do otherwise. See that my time is out, Your Honor. Any questions from the panel? I think the defendant has used his time. Case is submitted. Thank you both for your arguments this morning.